

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ONEGO SHIPPING
SHIPPING & CHARTERING BV
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax:  (516) 767-3605
Owen F. Duffy (OD-3144)
Michael S. Weinstock (MW-8520)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ONEGO SHIPPING & CHARTERING BV,

                         Plaintiff,

        v.

OCEAN BULK CARRIERS CORP.,

                          Defendant.
-----------------------------------------------------------------X

09 CV _____ (___)

**VERIFIED COMPLAINT**

      Plaintiff Onego Shipping & Chartering BV (hereinafter "ONEGO SHIPPING"),

by its attorneys, Chalos, O'Connor & Duffy, as and for its Verified Complaint against the

Defendant, OCEAN BULK CARRIERS CORP. (hereinafter "OCEAN BULK"), alleges

upon information and belief as follows:

<u>JURISDICTION</u>

      1.     This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure, and falls under this Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. § 1333. Additionally, this case falls within

the ambit of this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that the action arises under the Federal Arbitration Act, 9 U.S.C. § 1, *et. seq.*

## THE PARTIES

2.     At all times material hereto, Plaintiff ONEGO SHIPPING, was and still is a foreign business entity, duly organized and existing pursuant to the laws of the Netherlands.

3.     Plaintiff ONEGO SHIPPING maintains an office and principal place of business at Spui 24 3161 ED Rhoon, Rotterdam, the Netherlands.

4.     At all times material hereto, Plaintiff ONEGO SHIPPING, was and is, engaged in the business of owing, chartering and operating ocean vessels engaged in the carriage of cargo in exchange for payments of hire and/or freight.

5.     At all times material hereto, Plaintiff ONEGO SHIPPING was the owner, or disponent owner, of the ocean-going motor vessel ONEGO PASSAT.

6.     At all times material hereto, Defendant OCEAN BULK was and still is a foreign business entity duly organized and existing pursuant to the laws of Panama.

7.     The office and principal place of business of the Defendant OCEAN BULK is unknown, but the Defendant has represented on numerous occasions that its place of business is in care of Frutamar Internacional Ltda. at Blanco 1663, Of. 1601, in Valparaiso, Chile.

8.     The Defendant OCEAN BULK is a subsidiary of Frutamar Internacional Ltda., which is a Chilean company that is engaged in the business of exporting various

commodities, *i.e.* produce, fruit, grains and rock salt, from Central and South America to buyers in various countries around the world.

9.     The Defendant OCEAN BULK charters vessels for Frutmar Internacional Ltda. so that Frutamar Internacional Ltda. will have vessels to transport its export cargoes to its various customers/buyers around the world.


AS AND FOR A CAUSE OF ACTION
FOR BREACH OF A MARITIME CONTRACT

THE MARITIME CONTRACT:

10.     On or about August 17, 2009 Plaintiff ONEGO SHIPPING, as Owner of the M/V ONEGO PASSAT, entered into a Charter Party contract with Defendant OCEAN BULK, as Charterer, for the use of ONEGO SHIPPING's M/V ONEGO PASSAT. (hereinafter the "Charter Party").

11.     The Charter Party contract is in the form of a fixture recap, which set forth the main terms of the contract and otherwise incorporated the terms and conditions of a previous or *proforma* charter party for the M.V. CLIPPER STAMFORD. *See*, Exhibit A, Fixture Recap which provides: "otherwise "clipper stamford" cp dtd 23.04.04 logically amended as per main terms and following...." *See also*, Exhibit B, Proforma charter party for the M.V. CLIPPER STAMFORD.

12.     In accordance with the terms and conditions of the Charter Party, it was agreed between the Plaintiff and Defendant that the Defendant OCEAN BULK would ship a cargo of 7,200 m/t of rock salt, in bulk, on board the M.V. ONEGO PASSAT from Caleta Patillos, Chile to Balboa, Panama, the vessel would carry the Defendant OCEAN

3

BULK's cargo to Balboa and the Defendant would pay freight to the Plaintiff at the rate of at $24.00 per metric ton of cargo.

13.    As per the terms and conditions of the Charter Party, Defendant OCEAN BULK warranted that Plaintiff ONEGO SHIPPING's vessel would only be directed to load and/or discharge at "1spb aaaa", meaning one safe port berth that was always accessible and would always permit the vessel to remain afloat. *See*, Exhibit A.

14.    As per the terms and conditions of the Charter Party, in the event of any disputes arising from the Charter Party, the Plaintiff and Defendant agreed that all such disputes would be adjudicated by arbitrators in London and that the Charter Party was to be governed by English law. *See*, Exhibit A.

15.    The Charter Party, dated August 17, 2009, between plaintiff ONEGO SHIPPING and defendant OCEAN BULK is a maritime contract.

THE BREACH OF THE MARITIME CONTRACT:

16.    In accordance with the terms and conditions of the Charter Party, the M/V ONEGO PASSAT was to proceed to the Port of Caleta Patillos for loading and to arrive there between September 7th and September 17th, 2009 for loading the Defendant OCEAN BULK's cargo. *See,* Exhibit A.

17.    The M.V. ONEGO PASSAT was ready to depart from the Port of San Antonio Chile to proceed to the loading Port of Caleta Patillos.

18.    Before the M.V. ONEGO PASSAT proceeded to the Port of Caleta Patillos, the Defendant OCEAN BULK cancelled and repudiated the Charter Party on August 25, 2009.

19.     According to the Defendant OCEAN BULK, it was advised by the
Charterer's intended loading terminal that the facility was not accessible for the M/V
ONEGO PASSAT, nor would the M/V ONEGO PASSAT be permitted to load the
Defendant's cargo at Caleta Patillos because: (1) the vessel's cranes were situated on the
vessel's port side, which would prevent the vessel from safely berthing at Caleta Patillos,
because vessels were only permitted to berth port side to; and, (2) the height of the
vessel's crane masts exceeded the maximum height permitted by the Charterer's terminal,
which would prevent the vessel from berthing safely.

20.     The Defendant OCEAN BULK advised the Plaintiff ONEGO SHIPPING
that Defendant was attempting to make arrangements to ship the cargo from an
alternative terminal in Chile, but it was unable to do so.

21.     As a consequence of the Defendant's failure to provide an accessible and
safe port & berth for the M/V ONEGO PASSAT to load the Defendant's cargo, the
Defendant OCEAN BULK did not load the cargo of rock salt on board the M.V. ONEGO
PASSAT.

22.     By reason of the circumstances referred to herein at ¶s 16 through 21, the
Defendant OCEAN BULK breached its obligations under the Charter Party because
Defendant OCEAN BULK: a) failed to provide the M/V ONEGO PASSAT with a safe
and accessible berth to load the intended cargo; b) failed to ship the cargo on board the
vessel as it was required to under the terms of the contract; and, c) failed to pay the
freight for the use of the M/V ONEGO PASSAT.

THE DAMAGES FOR THE BREACHES OF THE MARITIME CONTRACT:

23.     The breaches of the maritime contract by the Defendant OCEAN BULK were the proximate cause of damages that were incurred by Plaintiff ONEGO SHIPPING by way of loss of income because of freight not paid by Defendant OCEAN BULK in the principal amount of $161,836.11.

24.     In circumstances similar to this case, the measure of damages is the net amount that would have been earned by the vessel under the charter sued on, less the net amount earned, or which might with reasonable diligence have been earned, by the vessel during the time required for the performance of the voyage named in such contract of charter. LeBlond v. McNear, 104 F. 826, 830-31 (N.D. Cal. 1990), aff'd, 123 F. 384 (9th Cir. 1993), and the approach usually applied is to calculate a daily rate of return under the cancelled charter, compare it with the rate of return actually earned and multiply the difference by the number of days the cancelled charter would have taken. See, VOYAGE CHARTERS 2ND ED at §§ 21.171 to 21.175.

25.     Under the Charter Party cancelled by Defendant OCEAN BULK, the daily rate of return is calculated to be $12,800.00 See, Exhibit C, Voyage Calculation for the Charter Party, and consider: 7,200m/t x $24.00 per ton = $172,800, then divided by the 13.5 days it would have taken to perform the contract = $12,800.00.

26.     Because the Charter Party was cancelled by Defendant OCEAN BULK, the Plaintiff ONEGO SHIPPING attempted to mitigate its damages by seeking alternative employment for the M/.V ONEGO PASSAT, and Plaintiff ONEGO SHIPPNG was able to find a cargo of sugar in the same quantity as the rock salt cargo to carry from Puerto

Quetzal to Puerto Coatzacoalcos, at a higher rate of freight, but which required a much longer voyage of 36.2 days.

27.     The daily rate of return under the mitigating sugar charter is only $812.14. *See*, Exhibit D, Voyage Calculation for sugar cargo, and consider 7,200m/t of sugar x $44.00 per ton = $316,000, which is then divided by the 36.2 days that it takes to perform the voyage to Puerto Coatzacoalcos and discharge the sugar cargo.

28.     The difference on the daily rate of return between the Charter Party that was cancelled and the Charter Party that was performed in mitigation is a loss of $11,987.86 per day.

29.     In accordance with the rule of LeBlond v. McNear, the difference between the daily rates of return multiplied by the number of days for the cancelled charter ($11,987.86 x 13.5) results in the principal claim for damages in the amount of $161,836.11.

### PLAINTIFF IS INITIATING ARBITRATION PROCEEDINGS AGAINST DEFENDANT OCEAN BULK IN LONDON

30.     In accordance with the terms and conditions of the Charter Party contract, plaintiff ONEGO SHIPPING and defendant OCEAN BULK agreed to resolve any disputes arising under the Charter Party by arbitration in London with English law to apply. *See*, Exhibit A.

31.     In accordance with the agreement to arbitrate any disputes arising under the Charter Party, plaintiff ONEGO SHIPPING is, or is preparing to, initiate arbitral proceedings against defendant OCEAN BULK in London to recover its damages for the breach of the Charter Party.

32.    The Plaintiff ONEGO SHIPPING is, however, seeking to obtain security for its claim against the Defendant OCEAN BULK before initiating the arbitration proceedings so that it will have a meaningful and realistic opportunity to recover its damages before it incurs the costs to pursue the claim through arbitration in London.

THE DAMAGES SOUGHT
AS SECURITY FOR THE BREACH OF THE MARITIME CONTRACT

33.    Under English law, including but not limited to § 63 of the English Arbitration Act of 1996, the London Maritime Arbitration Association's rules, and/or the international arbitration act of London, costs, including solicitor' fees, arbitrator's fees, disbursements and interest are recoverable damages in arbitration and such damages are routinely awarded to the prevailing party in London arbitration held pursuant to English law.

34.    As best as can now be estimated, Plaintiff ONEGO SHIPPING expects to recover the following amounts in London arbitration from Defendant OCEAN BULK:

| | | | |
|---|---|---|---|
| A. | Principal claim | $ | 161,836.11 |
| B. | Estimated interest on claims: | $ | 40,413.13 |
| | 3 years at 7.5%, compounded quarterly | | |
| C. | Estimated London solicitor's fees: | $ | 50,000.00 |
| D. | Estimated arbitration costs/expenses: | $ | 20,000.00 |
| | **Total Claim:** | $ | **272,249.24** |

PRAYER FOR RELIEF

35.    Notwithstanding the fact that the liability of defendant OCEAN BULK for the alleged breach of Charter Party, as set forth herein, is subject to determination by arbitration in London, there are now, or will be during the pendency of this action, certain

assets, accounts, freights, monies, charter hire, credits, effects, payments for goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant within this District and held by various parties, as garnishees.

36.    Plaintiff ONEGO SHIPPING has sufficient reason to believe that defendant OCEAN BULK's tangible or intangible personal property or other assets, *to wit*: bank accounts; payments of freight and/or hire in U.S. dollars to other vessel Owners from the Defendant and payments of U.S. dollars to the Defendant from third party Owners of cargo, vendors and/or suppliers; and/or Clearing House Interbank Payment System (CHIPS) credits; and/or operational funds being transferred through intermediary banks in the for of electronic payment transfers (i.e. "EFT"s) are located in this District in the possession of several garnishees and said garnishees are enumerated in the proposed Process of Maritime Attachment and Garnishment.

37.    The Plaintiff ONEGO SHIPPING states as grounds for the statements set forth in ¶s 35 & 36 herein that Defendant OCEAN BULK has previously made payments to others, including the Owner of the M.V. CLIPPER STAMFORD, in U.S. dollars by electronic fund transfer which were processed by intermediary banks in New York and, furthermore, Defendant OCEAN BULK continues to trade in U.S. dollars, as is evidenced by the payment terms of the Charter Party at issue in this case, such that the Defendant OCEAN BULK is making or receiving payments in U.S. dollars on a regular basis, all of which are processed by intermediary banks located in this district.

38.    As set forth in the accompanying Declaration of Owen F. Duffy, Defendant OCEAN BULK cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure. *See*, Exhibit E, attached hereto.

39. Because this Verified Complaint sets forth an *in personam* maritime claim against Defendant OCEAN BULK, because Defendant OCEAN BULK cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure, because the Plaintiff has reason to believe that the property of the Defendant may be found in this district and because there is no statutory or maritime bar to an attachment, the requirements for the issuance of Rule B Process of Maritime Attachment and Garnishment are met.

40. The Plaintiff seeks the issuance of process of maritime attachment so that it may obtain security for its claims against defendant OCEAN BULK and/or *quasi in rem* jurisdiction over the property of the Defendant so that an eventual arbitration award and/or judgment confirming the arbitration award can be satisfied.

WHEREFORE, Plaintiff prays as follows:

A. That the defendant OCEAN BULK be summoned to appear and answer this Verified Complaint;

B. That defendant OCEAN BULK not being found within this District, as set forth in the Declaration of Owen F. Duffy, then all of its tangible and intangible property, including assets, accounts, freights, monies, charter hire, credits, effects, payment for goods or services, bills of lading, cargo, raw materials and the like belonging to or claimed by the Defendant, within this District up to the amount sued for herein be

attached pursuant to Supplemental Rule B and restrained by the garnishees of the Defendant to pay the Plaintiff's damages;

        C.    That this Court retain jurisdiction over this matter through the entry of an arbitration award by an arbitration tribunal in London and/or, if necessary, a judgment from this Court confirming the award of the London arbitration tribunal so that judgment may be entered in favor of plaintiff Onego Shipping for the amount of its claim with costs, *i.e.* **$272,249.24,** and that a judgment of condemnation and sale be entered against the property restrained and attached herein in the amount of Plaintiff's claim, plus costs to be paid out of the proceeds thereof; and

        D.    That Plaintiff has such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated: Port Washington, New York
       October 8, 2009

                                      CHALOS, O'CONNOR & DUFFY, LLP
                                      Attorneys for Plaintiff,
                                      ONEGO SHIPPING & CHARTERING BV

By:    _____
             Owen F. Duffy (OD-3144)
             Michael S. Weinstock (MW-8520)
             366 Main Street
             Port Washington, New York 11050
             Tel:  (516) 767-3600
             Fax:  (516) 767-3605
             Email: ofd@codus-law.com

# EXHIBIT A

RAIMOND - APS / TURID

Good aft Gents

For sake of good order - appreciate yr confirmation that in accordance
with negs - tks vm
Re: Onego Passat / Acct OBC

Pleased to recap as fixed clean:

'Onego Passat' cp dtd 17.08.09
===============================

MV ONEGO PASSAT
------------
TYPE OF VSL              : BOX SINGLEDECK OPENHATCH
CLASS                    : CHINESE REGISTER
YEAR BUILT               : 2007
FLAG                     : CYPRUS
P & I                    : STEAMSHIP UK
GRT                      : 5652
NRT                      : 2687
DEADWEIGHT               : 7708.7
LOA                      : 117.00 M
BREADTH MOULDED          : 19.70 M
DEPTH MOULDED            : 8.50 M
SUMMER DRAUGHT           : 6.60 M
TYPE OF HATCHES          : PONTOON
NUMBER OF HOLDS/HATCHES  : 3 / 3
BOWTHRUSTER              : YES
GEAR                     : 2 X 40 MT
CUBIC CAPACITY           : abt 9541 CBM / 336937 CBFT
ELECTRICAL VENTILATED    : YES + FERROSILICON FITTED
ICE CLASS                : SWEDISH/FINNISH 1B

HOLD 1: 19.50 X 15.00 X 8.7 M / HATCH 19.50 X 15.00 HOLD 2: 31.85 X
15.00 X 8.7 M / HATCH 31.85 X 15.00 HOLD 3: 25.35 X 15.00 X 8.7 M /
HATCH 25.35 X 15.00

ALL ABOVES ARE GIVEN IN GOOD FAITH BUT NOT GUARANTEED

For:

- Acct: OBC
- 7200mt rock salt in bulk
- intended Stowage Plan:
Hold 1 = 1,700 MT
Hold 2 = 3,300 Mt
Hold 3 = 2,200 Mt
       ========
Total    7,200 MT
- Load: caleta patillos , 1 spb aaaa
- Disch: balboa , 1 spb aaaa
- Laycan: 7/17 Sept 2009
- Load: 24 consec hrs shinc
- Disch: 5000 mts pwwd of 24 consec hrs shinc
- Frt: USD 24.00 pmt fiost

- Dem usd 6,000 pdpr/hd bends
- NOR to be presented 09.00 to 17.00 Monday to Sunday. At load/disch
ports time to count 12 hours after nor tendered. At load and at
discharge prior time used to count as laytime.
- Lime washing is required and tb for ows time + expenses
- Charts agents bends:

At Load:

Saam s.a.  / headoffice
blanco 895 - valparaiso / chile
line managers dept.
email : linemanager@saamsa.com
ph 56-32-2201108 / 2201102
fx 56-32-2201701
web : www.saamsa.com

pic1  idamarie mahn
mobile 56-9-89015371
email : imahn@saam.cl

pic2  marcela coronel
mobile     56-9-89015373
email :    mcoronel@saam.cl

At Disch:

c. fernie & co.
email:  fernie@cfernie.com
tel.:  (507) 211 9488
contacto:  gian carlo calvosa

- G/A, arbitration in London, English law to apply
- 5.00 pct tll here incl 2.5 adc
- Otherwise 'clipper stamford' cp dtd 23.04.08 logically amended as
per main terms and following:

Clause 22.1

Please add: in case chrtrs require freight prepaid bs/l then Bs/L are
not to be released until owners written confirmation that freight is
received in owners bank acct.


banking details are as follows:

Rabobank
Voorne-Putten Rozenburg
Account 1266.58.463
IBAN NL82RABO0126658463
SWIFT RABONL2U

corresponding bank in USA
JP Morgan Chase Bank N.A.
swiftcode : CHASUS 33

Benificiary:Onego Shipping & Chartering
VAT no: NL.8101.09.700.B.01

Clause 23.7: Please add the black line:
Vessel shall arrive at loading port with cargo holds clean, dry, free
of cargo residue and in all respect ready to receive cargo subject to
Charterers' inspection and approval. If holds are rejected, laytime
not to count from the moment of rejection until vessel is passed/
holds accepted.

End recap

Brgds/

# EXHIBIT B

ORIGINAL

RECOMMENDED
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL
UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)
(To be used for trades for which no specially approved form is in force)
CODE NAME: "GENCON"                                                                Part I

| 1. Shipbroker | 2. Place and date |
|---|---|
| UNIVERSAL CHARTERING S.A.<br>Santiago, Chile<br><br>Disponent | Santiago (Chile), 23rd April 2008 |

| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
|---|---|
| CLIPPER BULK (SINGAPORE) PTE. LTD. | OCEAN BULK CARRIERS CORP. PANAMA<br>C/O FRUTAMAR INTERNACIONAL LTDA.<br>BLANCO 1663, OF. 1601<br>Valparaiso, Chile |

| 5. Vessel's name (Cl. 1) | 6. GT/NT (Cl. 1) |
|---|---|
| M.V. "CLIPPER STAMFORD" (See Clause 18.1) | ---- |

| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
|---|---|
| --- | Trading |

| 9. Expected ready to load (abt.) (Cl. 1) | |
|---|---|
| 9th May 2008 | |

| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
|---|---|
| one (1) safe berth one (1) safe port always accessible CALETA PATILLOS, where Charterers guarantee minimum 32' SW | (See Clause 21) |

12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl. 1)

one (1) shipment of maximum 20.000 metric ton 10% less in Owners' option BULK ROCKSALT SF about 31' WOG

| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |
|---|---|
| (See Clause 22) | (See Clause 22.1) |

| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
|---|---|
|  | (a) Laytime for loading<br>25.000 MTS PER WWD SHINC |
| 17. Shippers/Place of business (Cl. 6) | (b) Laytime for discharging 5.000 MTS PER WWD SHINC BALBOA<br>4.000 MTS PER WWD SHINC CARTAGENA |
| 18. Agents (loading) (Cl. 6) | (c) Total laytime for loading and discharging |
| 19. Agents (discharging) (Cl. 6) |  |

| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7) | 21. Cancelling date (Cl. 9) |
|---|---|
| US$ 23,500 PER DAY HALF DESPATCH LAYTIME SAVED BOTH ENDS | 25th May 2008 |
| | 22. General Average to be adjusted at (Cl. 12) |

| 23. Freight Tax (state if for the Owners' account (Cl .13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15) |
|---|---|
| (See Clause 26) | 1.25% to UNIVERSAL CHARTERING S.A.<br>2.5% Address Commission |

| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19) | |
|---|---|
| (As per Clause 33) | |

| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed Clauses 18 to 39 to be considered as fully incorporated into this Charter Party. |
|---|---|

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

UNICHART
Fono 639 1133
Fax 639 5888
St. Lucia 188 P.B.



**PART II**
**"Gencon" Charter (As Revised 1922, 1976 and 1994)**

the party mentioned in Box 3 as the Owners of the Vessel | 1
named in Box 5 and of the GT/NT indicated in Box 5 and carrying about the number | 2
of metric tons of deadweight capacity all told on summer loadline stated in Box | 3
7, now in position as stated in Box 6 and expected ready to load under this | 4
Charter about the date indicated in Box 9, and the party mentioned as the | 5
Charterers in Box 4 that: | 6
The said Vessel shall, as soon as her prior commitments have been completed, | 7
proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as | 8
she may safely get and lie always afloat, and there load a full and complete | 9
cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and | 10
responsibility) as stated in Box 12, which the Charterers bind themselves to | 11
ship, and being so loaded the Vessel shall proceed to the discharging port(s) or | 12
place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near | 13
thereto as she may safely get and lie always afloat, and there deliver the cargo. | 14

**2. Owners' Responsibility Clause** | 15
The Owners are to be responsible for loss of or damage to the goods or for | 16
delay in delivery of the goods only in case the loss, damage or delay has been | 17
caused by personal want of due diligence on the part of the Owners or their | 18
Manager to make the Vessel in all respects seaworthy and to secure that she is | 19
properly manned, equipped and supplied, or by the personal act or default of | 20
the Owners or their Manager. | 21
And the Owners are not responsible for loss, damage or delay arising from any | 22
other cause whatsoever, even from the neglect or default of the Master or crew | 23
or some other person employed by the Owners on board or ashore for whose | 24
acts they would, but for this Clause, be responsible, or from unseaworthiness of | 25
the Vessel on loading or commencement of the voyage or at any time | 26
whatsoever. | 27

**3. Deviation Clause** | 28
The Vessel has liberty to call at any port or ports in any order, for any purpose, | 29
to sail without pilots, to tow and/or assist Vessels in all situations, and also to | 30
deviate for the purpose of saving life and/or property. | 31

**4. Payment of Freight    (See Clause 22,1)** | 32
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the | 33
intaken quantity of cargo. | 34
(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be | 35
deemed earned and non-returnable, Vessel and/or cargo lost or not lost. | 36
Neither the Owners nor their agents shall be required to sign or endorse bills of | 37
lading showing freight prepaid unless the freight due to the Owners has | 38
actually been paid. | 39
(c) On delivery. If according to Box 13 freight, or part thereof, is payable at | 40
destination it shall not be deemed earned until the cargo is thus delivered. | 41
Notwithstanding the provisions under (a), if freight or part thereof is payable on | 42
delivery of the cargo the Charterers shall have the option of paying the freight | 43
on delivered weight/quantity provided such option is declared before breaking | 44
bulk and the weight/quantity can be ascertained by official weighing machine, | 45
joint draft survey or tally. | 46
Cash for Vessel's ordinary disbursements at the port of loading to be advanced | 47
by the Charterers, if required, at highest current rate of exchange, subject to | 48
two (2) per cent to cover insurance and other expenses. | 49

**5. Loading/Discharging** | 50
(a) Costs/Risks | 51
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, | 52
tallied, lashed and/or secured and taken from the holds and discharged by the | 53
Charterers, free of any risk, liability and expense whatsoever to the Owners. | 54
The Charterers shall provide and lay all dunnage material as required for the | 55
proper stowage and protection of the cargo on board, the Owners allowing the | 56
use of all dunnage available on board. The Charterers shall be responsible for | 57
and pay the cost of removing their dunnage after discharge of the cargo under | 58
this Charter Party and time to count until dunnage has been removed. | 59
(b) Cargo Handling Gear | 60
Unless the Vessel is gearless or unless it has been agreed between the parties | 61
that the Vessel's gear shall not be used and stated as such in Box 15, the | 62
Owners shall throughout the duration of loading/discharging give free use of | 63
the Vessel's cargo handling gear and of sufficient motive power to operate all | 64
such cargo handling gear. All such equipment to be in good working order. | 65
Unless caused by negligence of the stevedores, time lost by breakdown of the | 66
Vessel's cargo handling gear or motive power – pro rata the total number of | 67
cranes/winches required at that time for the loading/discharging of cargo | 68
under this Charter Party – shall not count as laytime or time on demurrage. | 69
On request the Owners shall provide free of charge cranemen/winchmen from | 70
the crew to operate the Vessel's cargo handling gear, unless local regulations | 71
prohibit this, in which latter event shore labourers shall be for the account of the | 72
Charterers. Cranemen/winchmen shall be under the Charterers' risk and | 73
responsibility and as stevedores to be deemed as their servants but shall | 74
always work under the supervision of the Master. | 75
(c) Stevedore Damage    (See Clause 28) | 76
The Charterers shall be responsible for damage (beyond ordinary wear and | 77
tear) to any part of the Vessel caused by Stevedores. Such damage shall be | 78
notified as soon as reasonably possible by the Master to the Charterers or their | 79
agents and to their Stevedores, failing which the Charterers shall not be held | 80
responsible. The Master shall endeavour to obtain the Stevedores' written | 81
acknowledgement of liability. | 82
The Charterers are obliged to repair any stevedore damage prior to completion | 83
of the voyage, but must repair stevedore damage affecting the Vessel's | 84
seaworthiness or class before the Vessel sails from the port where such | 85
damage was caused or found. All additional expenses incurred shall be for the | 86
account of the Charterers and any time lost shall be for the account of and shall | 87
be paid to the Owners by the Charterers at the demurrage rate. | 88

**6. Laytime    (See Clause 23)** | 89
*(a) Separate laytime for loading and discharging* | 90
The cargo shall be loaded within the number of running days/hours as | 91
indicated in Box 16, weather permitting, Sundays and holidays excepted, | 92
unless used, in which event time used shall count. | 93
The cargo shall be discharged within the number of running days/hours as | 94
indicated in Box 16, weather permitting, Sundays and holidays excepted, | 95
unless used, in which event time used shall count. | 96
*(b) Total laytime for loading and discharging* | 97
The cargo shall be loaded and discharged within the number of total running | 98
days/hours as indicated in Box 16, weather permitting, Sundays and holidays | 99
excepted, unless used, in which event time used shall count. | 100
(c) Commencement of laytime (loading and discharging) | 101
Laytime for loading and discharging shall commence at 13.00 hours, if notice of | 102
readiness is given up to and including 12.00 hours, and at 06.00 hours next | 103
working day if notice given during office hours after 12.00 hours. Notice of | 104

readiness at loading port to be given to the Shippers named in Box 17 or if not | 105
named, to the Charterers or their agents named in Box 18. Notice of readiness | 106
at the discharging port to be given to the Receivers or, if not known, to the | 107
Charterers or their agents named in Box 19. | 108
If the loading/discharging berth is not available on the Vessel's arrival at or off | 109
the port of loading/discharging, the Vessel shall be entitled to give notice of | 110
readiness within ordinary office hours on arrival there, whether in free pratique | 111
or not, whether customs cleared or not. Laytime or time on demurrage shall | 112
then count as if she were in berth and in all respects ready for loading/ | 113
discharging provided that the Master warrants that she is in fact ready in all | 114
respects. Time used in moving from the place of waiting to the loading/ | 115
discharging berth shall not count as laytime. | 116
If, after inspection, the Vessel is found not to be ready in all respects to load/ | 117
discharge time lost after the discovery thereof until the Vessel is again ready to | 118
load/discharge shall not count as laytime. | 119
Time used before commencement of laytime shall count. | 120
* indicate alternative (a) or (b) as agreed, in Box 16. | 121

**7. Demurrage    (See Clause 23)** | 122
Demurrage at the loading and discharging port is payable by the Charterers at | 123
the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for | 124
any part of a day. Demurrage shall fall due day by day and shall be payable | 125
upon receipt of the Owners' invoice. | 126
In the event the demurrage is not paid in accordance with the above, the | 127
Owners shall give the Charterers 96 running hours written notice to rectify the | 128
failure. If the demurrage is not paid at the expiration of this time limit and if the | 129
vessel is in or at the loading port, the Owners are entitled at any time to | 130
terminate the Charter Party and claim damages for any losses caused thereby. | 131

**8. Lien Clause** | 132
The Owners shall have a lien on the cargo and on all sub-freights payable in | 133
respect of the cargo, for freight, deadfreight, demurrage, claims for damages | 134
and for all other amounts due under this Charter Party including costs of | 135
recovering same. | 136

**9. Cancelling Clause** | 137
(a) Should the Vessel not be ready to load (whether in berth or not) on the | 138
cancelling date indicated in Box 21, the Charterers shall have the option of | 139
cancelling this Charter Party. | 140
(b) Should the Owners anticipate that, despite the exercise of due diligence, | 141
the Vessel will not be ready to load by the cancelling date, they shall notify the | 142
Charterers thereof without delay stating the expected date of the Vessel's | 143
readiness to load and asking whether the Charterers will exercise their option | 144
of cancelling the Charter Party, or agree to a new cancelling date. | 145
Such option must be declared by the Charterers within 48 running hours after | 146
the receipt of the Owners' notice. If the Charterers do not exercise their option | 147
of cancelling, then this Charter Party shall be deemed to be amended such that | 148
the seventh day after the new readiness date stated in the Owners' notification | 149
to the Charterers shall be the new cancelling date. | 150
The provisions of sub-clause (b) of this Clause shall operate only once, and in | 151
case of the Vessel's further delay, the Charterers shall have the option of | 152
cancelling the Charter Party as per sub-clause (a) of this Clause. | 153

**10. Bills of Lading** | 154
Bills of Lading shall be presented and signed by the Master as per the | 155
"Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter | 156
Party, or by the Owners' agents provided written authority has been given by | 157
Owners to the agents, a copy of which is to be furnished to the Charterers. The | 158
Charterers shall indemnify the Owners against all consequences or liabilities | 159
that may arise from the signing of bills of lading as presented to the extent that | 160
the terms or contents of such bills of lading impose or result in the imposition of | 161
more onerous liabilities upon the Owners than those assumed by the Owners | 162
under this Charter Party. | 163

**11. Both-to-Blame Collision Clause** | 164
If the Vessel comes into collision with another vessel as a result of the | 165
negligence of the other vessel and any act, neglect or default of the Master, | 166
Mariner, Pilot or the servants of the Owners in the navigation or in the | 167
management of the Vessel, the owners of the cargo carried hereunder will | 168
indemnify the Owners against all loss or liability to the other or non-carrying | 169
vessel or her owners in so far as such loss or liability represents loss of, or | 170
damage to, or any claim whatsoever of the owners of said cargo, paid or | 171
payable by the other or non-carrying vessel or her owners to the owners of said | 172
cargo and set-off, recouped or recovered by the other or non-carrying vessel | 173
or her owners as part of their claim against the carrying Vessel or the Owners. | 174
The foregoing provisions shall also apply where the owners, operators or those | 175
in charge of any vessel or vessels or objects other than, or in addition to, the | 176
colliding vessels or objects are at fault in respect of a collision or contact. | 177

**12. General Average and New Jason Clause** | 178
General Average shall be adjusted in London unless otherwise agreed in Box | 179
22 according to York-Antwerp Rules 1994 and any subsequent modification | 180
thereof. Proprietors of cargo to pay the cargo's share in the general expenses | 181
even if same have been necessitated through neglect or default of the Owners' | 182
servants (see Clause 2). | 183
If General Average is to be adjusted in accordance with the law and practice of | 184
the United States of America, the following Clause shall apply: "In the event of | 185
accident, danger, damage or disaster before or after the commencement of the | 186
voyage, resulting from any cause whatsoever, whether due to negligence or | 187
not, for which, or for the consequence of which, the Owners are not | 188
responsible, by statute, contract or otherwise, the cargo shippers, consignees | 189
or the owners of the cargo shall contribute with the Owners in General Average | 190
to the payment of any sacrifices, losses or expenses of a General Average | 191
nature that may be made or incurred and shall pay salvage and special charges | 192
incurred in respect of the cargo. If a salving vessel is owned or operated by the | 193
Owners, salvage shall be paid for as fully as if the said salving vessel or vessels | 194
belonged to strangers. Such deposit as the Owners, or their agents, may deem | 195
sufficient to cover the estimated contribution of the goods and any salvage and | 196
special charges thereon shall, if required, be made by the cargo, shippers, | 197
consignees or owners of the goods to the Owners before delivery.". | 198

**13. Taxes and Dues Clause** | 199
(a) On Vessel -The Owners shall pay all dues, charges and taxes customarily | 200
levied on the Vessel, howsoever the amount thereof may be assessed. | 201
(b) On cargo -The Charterers shall pay all dues, charges, duties and taxes | 202
customarily levied on the cargo, howsoever the amount thereof may be | 203
assessed. | 204
(c) On freight -Unless otherwise agreed in Box 23, taxes levied on the freight | 205
shall be for the Charterers' account. | 206

**PART II**
"Gencon" Charter (As Revised 1922, 1976 and 1994)

**14. Agency**   (See Clause 20.1)   207
~~In every case the Owners shall appoint their own Agent both at the port of~~   208
~~loading and the port of discharge.~~   209

**15. Brokerage**   210
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight   211
and demurrage earned is due to the party mentioned in Box 24.   212
In case of non-execution 1/3 of the brokerage on the estimated amount of   213
freight to be paid by the party responsible for such non-execution to the   214
Brokers as indemnity for the latter's expenses and work. In case of more   215
voyages the amount of indemnity to be agreed.   216

**16. General Strike Clause**   217
(a) If there is a strike or lock-out affecting or preventing the actual loading of the   218
cargo, or any part of it, when the Vessel is ready to proceed from her last port or   219
at any time during the voyage to the port of loading or after her arrival there,   220
there, the Master or the Owners may ask the Charterers to declare, that they   221
agree to reckon the laydays as if there were no strike or lock-out. Unless the   222
Charterers have given such declaration in writing (by telegram, if necessary)   223
within 24 hours, the Owners shall have the option of cancelling this Charter   224
Party. If part cargo has already been loaded, the Owners must proceed with   225
same, (freight payable on loaded quantity only) having liberty to complete with   226
other cargo on the way for their own account.   227
(b) If there is a strike or lock-out affecting or preventing the actual discharging   228
of the cargo on or after the Vessel's arrival at or off port of discharge and same   229
has not been settled within 48 hours, the Charterers shall have the option of   230
keeping the Vessel waiting until such strike or lock-out is at an end against   231
paying half demurrage after expiration of the time provided for discharging   232
until the strike or lock-out terminates and thereafter full demurrage until the   233
payable until the completion of discharging, or of ordering the Vessel to a safe   234
port where she can safely discharge without risk of being detained by strike or   235
lock-out. Such orders to be given within 48 hours after the Master or the   236
Owners have given notice to the Charterers of the strike or lock-out affecting   237
the discharge. On delivery of the cargo at such port, all conditions of this   238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive   239
the same freight as if she had discharged at the original port of destination,   240
except that if the distance to the substituted port exceeds 100 nautical miles,   241
the freight on the cargo delivered at the substituted port to be increased in   242
proportion.   243
(c) Except for the obligations described above, neither the Charterers nor the   244
Owners shall be responsible for the consequences of any strikes or lock-outs   245
preventing or affecting the actual loading or discharging of the cargo.   246

**17. War Risks ("Voywar 1993")**   247
(1) For the purpose of this Clause, the words:   248
(a) The "Owners" shall include the shipowners, bareboat charterers,   249
disponent owners, managers or other operators who are charged with the   250
management of the Vessel, and the Master; and   251
(b) "War Risks" shall include any war (whether actual or threatened), act of   252
war, civil war, hostilities, revolution, rebellion, civil commotion, warlike   253
operations, the laying of mines (whether actual or reported), acts of piracy,   254
acts of terrorists, acts of hostility or malicious damage, blockades   255
(whether imposed against all Vessels or imposed selectively against   256
Vessels of certain flags or ownership, or against certain cargoes or crews   257
or otherwise howsoever), by any person, body, terrorist or political group,   258
or the Government of any state whatsoever, which, in the reasonable   259
judgement of the Master and/or the Owners, may be dangerous or are   260
likely to be or to become dangerous to the Vessel, her cargo, crew or other   261
persons on board the Vessel.   262
(2) If at any time before the Vessel commences loading, it appears that, in the   263
reasonable judgement of the Master and/or the Owners, performance of   264
the Contract of Carriage, or any part of it, may expose, or is likely to expose,   265
the Vessel, her cargo, crew or other persons on board the Vessel to War   266
Risks, the Owners may give notice to the Charterers cancelling this   267
Contract of Carriage, or may refuse to perform such part of it as may   268
expose, or may be likely to expose, the Vessel, her cargo, crew or other   269
persons on board the Vessel to War Risks; provided always that if this   270
Contract of Carriage provides that loading or discharging is to take place   271
within a range of ports, and at the port or ports nominated by the Charterers   272
the Vessel, her cargo, crew, or other persons onboard the Vessel may be   273
exposed, or may be likely to be exposed, to War Risks, the Owners shall   274
first require the Charterers to nominate any other safe port which lies   275
within the range for loading or discharging, and may only cancel this   276
Contract of Carriage if the Charterers shall not have nominated such safe   277
port or ports within 48 hours of receipt of notice of such requirement.   278
(3) The Owners shall not be required to continue to load cargo for any voyage,   279
or to sign Bills of Lading for any port or place, or to proceed or continue on   280
any voyage, or on any part thereof, or to proceed through any canal or   281
waterway, or to proceed to or remain at any port or place whatsoever, where   282
it appears, either after the loading of the cargo commences, or at any   283
stage of the voyage thereafter before the discharge of the cargo is   284
completed, that, in the reasonable judgement of the Master and/or the   285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons   286
on board the Vessel (or any one or more of them) may be, or are likely to be,   287
exposed to War Risks. If it should so appear, the Owners may by notice   288
request the Charterers to nominate a safe port for the discharge of the   289
cargo or any part thereof, and if within 48 hours of the receipt of such   290
notice, the Charterers shall not have nominated such a port, the Owners   291
may discharge the cargo at any safe port of their choice (including the port   292
of loading) in complete fulfilment of the Contract of Carriage. The Owners   293
shall be entitled to recover from the Charterers the extra expenses of such   294
discharge and, if the discharge takes place at any port other than the   295
loading port, to receive the full freight as though the cargo had been   296
carried to the discharging port and if the extra distance exceeds 100 miles,   297
to additional freight which shall be the same percentage of the freight   298
contracted for as the percentage which the extra distance represents to   299
the distance of the normal and customary route, the Owners having a lien   300
on the cargo for such expenses and freight.   301
(4) If at any stage of the voyage after the loading of the cargo commences, it   302
appears that, in the reasonable judgement of the Master and/or the   303
Owners, the Vessel, her cargo, crew or other persons on board the Vessel   304
may be, or are likely to be, exposed to War Risks on any part of the route   305
(including any canal or waterway) which is normally and customarily used   306
in a voyage of the nature contracted for, and there is another longer route   307
to the discharging port, the Owners shall give notice to the Charterers that   308
this route will be taken. In this event the Owners shall be entitled, if the total   309
extra distance exceeds 100 miles, to additional freight which shall be the   310
same percentage of the freight contracted for as the percentage which the   311
extra distance represents to the distance of the normal and customary   312
route.   313

(5) The Vessel shall have liberty:-   314
(a) to comply with all orders, directions, recommendations or advice as to   315
departure, arrival, routes, sailing in convoy, ports of call, stoppages,   316
destinations, discharge of cargo, delivery or in any way whatsoever which   317
are given by the Government of the Nation under whose flag the Vessel   318
sails, or other Government to whose laws the Owners are subject, or any   319
other Government which so requires, or any body or group acting with the   320
power to compel compliance with their orders or directions;   321
(b) to comply with the orders, directions or recommendations of any war   322
risks underwriters who have the authority to give the same under the terms   323
of the war risks insurance;   324
(c) to comply with the terms of any resolution of the Security Council of the   325
United Nations, any directives of the European Community, the effective   326
orders of any other Supranational body which has the right to issue and   327
give the same, and with national laws aimed at enforcing the same to which   328
the Owners are subject, and to obey the orders and directions of those who   329
are charged with their enforcement;   330
(d) to discharge at any other port any cargo or part thereof which may   331
render the Vessel liable to confiscation as a contraband carrier;   332
(e) to call at any other port to change the crew or any part thereof or other   333
persons on board the Vessel when there is reason to believe that they may   334
be subject to internment, imprisonment or other sanctions;   335
(f) where cargo has not been loaded or has been discharged by the   336
Owners under any provisions of this Clause, to load other cargo for the   337
Owners' own benefit and carry it to any other port or ports whatsoever,   338
whether backwards or forwards or in a contrary direction to the ordinary or   339
customary route.   340
(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this   341
Clause anything is done or not done, such shall not be deemed to be a   342
deviation, but shall be considered as due fulfilment of the Contract of   343
Carriage.   344

**18. General Ice Clause**   345
*Port of loading*   346
(a) In the event of the loading port being inaccessible by reason of ice when the   347
Vessel is ready to proceed from her last port or at any time during the voyage or   348
on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the   349
Master for fear of being frozen in is at liberty to leave without cargo, and this   350
Charter Party shall be null and void.   351
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it   352
advisable to leave, he has liberty to do so with what cargo he has on board and   353
to proceed to any other port or ports with option of completing cargo for the   354
Owners' benefit for any port or ports including port of discharge. Any part   355
cargo thus loaded under this Charter Party to be forwarded to destination at the   356
Vessel's expense but against payment of freight, provided that no extra   357
expenses be thereby caused to the Charterers, freight being paid on quantity   358
delivered (in proportion if lumpsum), all other conditions as per this Charter   359
Party.   360
(c) In case of more than one loading port, and if one or more of the ports are   361
closed by ice, the Master or the Owners to be at liberty either to load the part   362
cargo at the open port and fill up elsewhere for their own account as under   363
section (b) or to declare the Charter Party null and void unless the Charterers   364
agree to load full cargo at the open port.   365
*Port of discharge*   366
(a) Should ice prevent the Vessel from reaching port of discharge the   367
Charterers shall have the option of keeping the Vessel waiting until the re-   368
opening of navigation and paying demurrage or of ordering the Vessel to a safe   369
and immediately accessible port where she can safely discharge without risk of   370
detention by ice. Such orders to be given within 48 hours after the Master or the   371
Owners have given notice to the Charterers of the impossibility of reaching port   372
of destination.   373
(b) If during discharging the Master for fear of the Vessel being frozen in deems   374
it advisable to leave, he has liberty to do so with what cargo he has on board and   375
to proceed to the nearest accessible port where she can safely discharge.   376
(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall   377
apply and the Vessel shall receive the same freight as if she had discharged at   378
the original port of destination, except that if the distance of the substituted port   379
exceeds 100 nautical miles, the freight on the cargo delivered at the substituted   380
port to be increased in proportion.   381

**19. Law and Arbitration**   (See Clause 33)   382
* (a) This Charter Party shall be governed by and construed in accordance with   383
English law and any dispute arising out of this Charter Party shall be referred to   384
arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or   385
any statutory modification or re-enactment thereof for the time being in force.   386
Unless the parties agree upon a sole arbitrator, one arbitrator shall be   387
appointed by each party and the arbitrators so appointed shall appoint a third   388
arbitrator, the decision of the three-man tribunal thus constituted or any two of   389
them, shall be final. On the receipt by one party of the nomination in writing of   390
the other party's arbitrator, that party shall appoint their arbitrator within   391
fourteen days, failing which the decision of the single arbitrator appointed shall   392
be final.   393
For disputes where the total amount claimed by either party does not exceed   394
the amount stated in Box 25** the arbitration shall be conducted in accordance   395
with the Small Claims Procedure of the London Maritime Arbitrators   396
Association.   397
* (b) This Charter Party shall be governed by and construed in accordance with   398
Title 9 of the United States Code and the Maritime Law of the United States and   399
should any dispute arise out of this Charter Party, the matter in dispute shall be   400
referred to three persons at New York, one to be appointed by each of the   401
parties hereto, and the third by the two so chosen; their decision or that of any   402
two of them shall be final, and for purpose of enforcing any award, this   403
agreement may be made a rule of the Court. The proceedings shall be   404
conducted in accordance with the rules of the Society of Maritime Arbitrators,   405
Inc.   406
For disputes where the total amount claimed by either party does not exceed   407
the amount stated in Box 25** the arbitration shall be conducted in accordance   408
with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators,   409
Inc.   410
* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at   411   US$50,000
the place indicated in Box 25, subject to the procedures applicable there. The   412
laws of the place indicated in Box 25 shall govern this Charter Party.   413
* (d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.   414
* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.   415
** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but   416
the other provisions of this Clause shall have full force and remain in effect.   417

# UNICHART

1

### Rider Clauses to the M.V. "CLIPPER STAMFORD"  Charter Party
### dated Santiago (Chile) 22TH  APRIL  2008

**18. Vessel's Description:**

-Vessel to be singledeck, self trimming bulkcarrier, fully P. and I. Covered during whole voyage, maximum, Highest Lloyd's or equivalent
-Vessel must be singledeck, engine aft,  dry BC
-Vessel not to have twin hatches and no center line beams or centerline bulkheads and no obstructions or fittings in the holds, including tunnels.
-Owners guarantee that vessel is suitable for complete discharge by grabs.
-Owners guarantee vessel has not traded Cuba or other countries where vessel could be prevented to discharge in the U.S. during the past 6 months.
- The vessel is to keep all gear and specially the cranes or derricks working in good order and suitable for grab discharge at all time. In case of failure or incapacity Charterers privilege to rent shore cranes and to be for Owners' account.
-Vessel must have MacGregor Folding Type Hatch covers.
- Charterers cannot accept Twin Deckers or Universal Gear, cranes or derricks to lift as described and anchors and windlass to be fully functional and operative.

**18.1 M/V "CLIPPER STAMFORD"**
Hong Kong flag, built 1998
Box shaped, double skinned, open hatch conbulker
Abt. 20,730mt deadweight on 9.70 meter SSW
loa./beam 157.90/23.10 meters
4 holds/hatches - hydraulic end folding hatch-covers
3 x 36 metric tonnes electro hydraulic jib cranes
grain/bale 843,333/840,331 cubic feet
GT/NT Int: 14,118/6,124
CO2/AWWF holdladderfitted
abt 15.0kn on abt 25mt IFO 380cst - nil MDO at sea
port idle abt 3.45mt IFO / port working abt 4.60mt IFO
Speed and consumption are given basis max Beaufort 4 and
Douglas Sea state 3.
Vessel has the liberty to use 'MDO' when manouvering in/out of ports
or in narrow/shallow waters, starting up/turning off engines and when
sailing in bad weather/rough sea
Bunkers supplied to be in accordance with ISO-specifications:
IFO; ISO 8217:2005(e)RMG380 - MDO; ISO 8217:2005 DMB.
No mixing of bunkers allowed.
- All details about -
Additional information (all details about):
- tanktop strength: 20.0mt/M2
   deck        : 2.5mt/M2
   hatchcover   : 2.5mt/M2
- 869 TEUS incl 54 reefer containers

# *UNICHART*

fully equipped with permanent container fittings:
flush container shoes on tanktop and
raised container shoes on deck (no OSHA)
partly equipped with loose container fittings/lashings
container loading is always subject to stability, trim,
strength, stress and visibility
- forced cargo hold ventilation giving
  6 airchanges per hour basis empy holds
- cubic breakdown: grain        bale
  number 1:  145,485     144,779
        2:    290,801     289,918
        3:    227,414     226,707
        4:    179,633     178,927
  total        843,333     840,331
- hatch-sizes (meters):
  number  1: 19.20(L) X 8.40-14.04-18.24
        2: 25.60(L) X 18.24
        3: 19.20(L) X 18.24
        4: 19.20(L) X 18.24-15.60-10.92
- hold dimensions (meters - on flat tank top):
        length   width           height
  number 1: 27.20   6.24/8.40/14.04/18.24  11.97
        2: 33.40   18.24                13.97
        3: 26.20   18.24                13.97
        4: 25.40   18.24/15.60/10.92      13.97
- All cargo holds are completely box/boxed off and double skinned
  i.e., the tanktop meets the side of the holds/bulkheads at a 90
  degree angle. All bulkheads are flush.
- TPC on SSW: 31.682mt
- Class: ABS +A1 (E), +AMS, +ACCU
- Suez NT: 12,371.83
- Panama NT:12,304.84
- deadweight on winter marks: Abt 20,092
- call sign: VRCB 6
- Inmarsat C telex: 456469310
- Vessel does not comply with SolasXII/5.1 and
  MSC.168(79) (heavy cargoes)".
- Owners: Clipper Bulk (Singapore) Pte. Ltd. as disponent owners
- Owners PandI: North of England P&I Association
- VSL SUITABLE FOR GRAB DISCHARGE
AA

Charterers not to use vessel's grabs unless reaching a separate written agreement regarding
terms and cost.

# *UNICHART*

### 19. Cargo and Quantity

One shipment of maximum 20.000 mt of Bulk Rocksalt stowing about 31' metric ton without guarantee.

Quantity to be declared by Owners/master upon berthing.

Cargo to be distributed evenly and trimmed in all holds/hatches to be able to get a balanced discharge, in as far as master deems stowage safe.

### 20. Notices

Owners/Master to give Charterers/Receivers 7/5 days and 48/24 hours of vessel arrival at loading and discharge ports.

ETA reports to be given 4/2/1 days at loading port and ETA on sailing loading port followed by 6/4/2/1 days loading port.

### 20.1. Agents

Owners' Agents at loading and Charterers' agents at Balboa and at Cartagena provided competitive.

### 21. Discharge Port :

One (1) safe berth one (1) safe port always afloat Balboa (about 10.000 grade A) where Charterers' guarantee minimum 30' SW and Cartagena (balance grade B).

### 22. Freight:

**US$ 51.00** per metric ton FIO spout trimmed basis 1 loding port to 2 discharging ports.

**22.1.** Freight to be fully payable within 5 banking days after signing/releasing Bill(s) of Lading but always before breaking bulk marked "Freight payable as per Charter Party" discountless and non-returnable vessel and/or cargo lost or not lost. Freight always to be paid prior to breaking bulk at discharge.
Full freight deemed earned as loaded is being loaded onboard, discountless, non-returnable, vessel and or cargo lost or not lost.

Freight is payable net into Owners' bank account as follows:

AMEGY BANK OF TEXAS
P.O.BOX 27459
HOUSTON, TEXAS 77227
USA
SWIFT CODE : SWBKUS44

# *UNICHART*

ABA No.    : 113-011-258
Account No. : 51576445
In Favour of: Bossclip B.V., Rotterdam
Ref        : "Clipper Stamford" C/P 23.4.2008

## 22.2. Bills of Lading

Shippers require 3/3 Original Bill of Lading, 7 copies non-negotiable duly signed and stamped and 2 non-negotiable copies signed and also duly freighted.

Bills of Lading to be claused "Freight payable as per Charter Party dated April 23rd 2008.

## 22.3 Cargo Quantity

Final loaded quantity to be established at loading port by draft survey by an independent surveyor nominated by Charterers or Consignees and cost for their account. Bills of Lading and freight to be in accordance with the draft survey quantity.

Time used for draft survey to count as laytime.

## 23. N.O.R. and Laytime both ends

Notice of Readiness to be given in writing when the vessel has arrived at the discharging or loading port and is in all respects ready to load or discharge. Notice of readiness to be tendered within office hours from 0900-1700 hours Monday to Sunday. If because of congestion vessel is unable to enter berth/port, then Notice of Readiness to be tendered by telex/e-mail/cable to agents  from customary waiting anchorage, whether in free pratique or nor, whether customs cleared or not, (provided pratique and customs clearance not withheld due to vessel's fault). In case  arrangements can be made to load or discharge during excepted periods, Captain to allow work to be done, such time used not to count.

At load/discharge ports laytime to commence 12 hours after tendering notice of readiness vessel being ready, and in free pratique.

Prior time used not to count as laytime.

## 23.1 Holidays

At loading and discharging port although terms are SHINC, time from December 24th-12:00 hours to December 26th – 08:00 hours and from December 31st – 12:00 hours to January 2nd – 08:00 hours not to count, even if used.

# *UNICHART*

**23. 2 Loading port**

At loading port in addition: time from May 1 – 00:00 hours to May 1 – 24:00 hours, time from, and time from September 18 – 00:00 hours to September 19 – 24:00 hours, not to count even if used.

**23.3 Discharging port**

Deleted

**23.4  Rain/Snow**

Time worked/used during rain or snow, laytime fully to count, if not worked time not to count.

**23.5 Deleted**

**23.6  Opening and closing hatches**

All opening and closing of hatches time not to count as laytime and cost to be for Owners' account unless opening of hatches by vessel's crew is prohibited by local regulations in which case cost of receivers' account.

From Notice of  Readiness tendered to discharge completed opening and closing hatches not to count as laytime.

If during discharge Captain decides to partially open the hatch, then discharge rate to be reduced by 50% to compensate the laytime.

**23.7 Clean holds**

Vessel shall arrive at loading port with cargo holds clean, dry, free of cargo residue and in all respect ready to receive cargo subject to Charterers' inspection and approval. If holds are rejected, laytime not to count until vessel is passed.

High humidity creating excess of condensation in vessel's holds creating excess of condensation in vessel's holds creating temporary stoppage of loading/discharging is considered a weather working delay.

**23.8 Lime Washing**

Charterers confirm no limewashing will be required.

# *UNICHART*

**23.9 Machine cleaning**

Upon completion of discharge, Charterers are to be responsible to leave the holds machine clean.

**23.10 Owners Responsibility**

Owners will be responsible in complying with arrival/sailing conditions in respect of  and air draft.

**24. Load and Discharge rate**

Loading and discharge rates according Clause 16 per weather working day SHINC.

**24.1 FIOST**

Deleted

**25. Demurrage/Despatch**

Demurrage, if any, shall be paid by Charterers to Owners at the rate of US$ 23.500 per day or pro rata for all time used in excess of allowed time, both at load and/or discharge ports. Despatch, if any, shall be paid by Owners to Charterers at the rate of US$ 11.750  per day or pro-rata for all laytime saved at load/discharge ports.

Laytime is to be non-reversible between discharging ports.

Laytime is to be non-reversible for all load/discharge ports.

**26. Taxes**

Taxes/dues on vessel for account of Owners.

Taxes/dues on cargo/freight to be for account of Charterers.

**27. Extra insurance**

Extra insurance, if any on the cargo by reason of vessel's age, flag, classification or ownership to be for Charterers' account.

**28. Stevedore Damage**

As per Gencon 94 Part II (Lines 77-88)

**29. Vessel Lights**

Vessel to give free use of light as on board if required for night work.

# UNICHART

**30. Laytime Exceptions**

Laytime shall be suspended for but not limited to any or all of the following reasons:

a) If vessel does not have all hatches open and ready to load/unload upon berthing, even if vessel is already on demurrage.
b) In Case of swell, surf or causes attributable to vessel which prevents normal loading and discharging, unless vessel is already on demurrage.

c) In case the Master requests that work or repairs be carried out to the vessel during loading and discharging time and this activity interferes with normal loading and discharging, all time so used not to count as laytime or time on demurrage even if vessel is already on demurrage.

Shifting from anchorage to berth (from anchor upto all fast) not to count as laytime.

**31. Ballasting/Deballasting**

Vessel to be suitable for quick ballasting and deballasting, and her Master to be cooperative in ballasting and deballasting the vessel in order to prevent loading or discharging delays or stoppages.

**32. Damage to Piers and Structures**

Owners guarantee the vessel is covered in first class P. & I. Club and will maintain coverage throughout the duration of the voyage.

**33.** Deleted

**34. Bunker Deviation Clause**

The vessel shall have liberty as part of the contract voyage and at any stage thereof may proceed to any port of ports whatsoever, on the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in sufficient quantity only to complete the respective voyage and in accordance with draft restrictions required at discharging port(s).

**35.** Deleted

**36. Confidentiality**

This fixture is strictly private and confidential.

**37.** Deleted

# UNICHART

**38. Cargo documents for discharge ports**

In case the Original Bills of Lading do not arrive in time to the discharge port, Owners to allow the discharge of cargo against presentation of a Letter of Indemnity signed by Charterers according to Owners' PandI Club wording. Time lost due to failure of Charterers to provide the LOI in time to permit Owners to make necessary arrangements to be for Charterers' account.

**39. Cancellation Clause:**

(a) Should the Vessel not be ready to load (whether in berth or not) on the agreed cancelling date, the Charterers shall have the option of cancelling this Charter Party.

(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.

Such option must be declared by the Charterers within 24 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.

-o-o-o-o-o-o-o-o-

/mlp

# EXHIBIT C

## VOYAGE CALCULATION DRY

Printed: 9-9-2009 16:43

### Vessel | ONEGO PASSAT

| | | | |
|---|---|---|---|
| Calculation: 109776 | Curr: USD | Running cost: 5.125 /day | Speed |
| Calc. Date: 25-8-2009 11:08 | | Deadweight: 8.000  Draft/SSW: 6,40 | Loaded: 12,00 |
| Done by: RDB | | Sqm/Grain Cap.: 336.943 | Ballast: 12,00 |
| | | Bale Cap.: 336.797 | |

### Charterers |

| | | |
|---|---|---|
| Charterer: OCEAN BULK CARRIERS | Commodity: SALT IN BULK | Gross freight: 172800 |
| Quantity: 7200  M | Loading: TOCOPILLA | Commission: 8640 |
| Rate: 24  M | Discharge: BALBOA | Net freight: 164160 |
| Terms Load: 1 D - SHINC | Terms Disch. 5000 M - SHINC | |
| Commission: 5,000 %   LOW: % | | |

### Estimated Port Calls |

| | T | J/D | Distance | Steam | Add.% | Port | Cost | C.Cost | Arrival | Departure |
|---|---|---|---|---|---|---|---|---|---|---|
| SAN ANTONIO | B | | | 0,00 | | | | | | 4-9-2009    9:54 |
| TOCOPILLA | L | | 697 | 2,42 | | 1,00 | 19014 | | 6-9-2009  19:58 | 7-9-2009  19:56 |
| BALBOA | D | | 2055 | 7,14 | | 1,44 | 11000 | | 14-9-2009 23:20 | 16-9-2009  9:53 |

### Fuel Details |

| Grade | Cons.Stm/day | Cons.Prt/day | Price | Total Cons.Tons | Total Cost | Voyage Days | | Extra |
|---|---|---|---|---|---|---|---|---|
| IFO | 11,00 | | 511 | 116,16 | 59.396 | Steam: | 9,56 | 1,00 |
| MDO | 1,00 | 1,00 | 597 | 13,50 | 8.060 | Port: | 2,44 | 0,50 |
| LSFO | | | 483 | 0,00 | 0 | Total days: | 13,50 | |
| LSMDO | | | 635 | 0,00 | 0 | Total distance: | 2.752 | |

### Financial Summary |

| | | | | | Sensitivity Analysis | | |
|---|---|---|---|---|---|---|---|
| Gross Freight: | 172.800 | | | | Rate/WS | Net Daily | Lumpsum |
| Other Income: | 0 | Net Daily: | 4.678 | | 22,50 | 3.918 | 0 |
| Bunker Compensation: | 0 | Running Cost: | 69.188 | | 22,75 | 4.045 | 0 |
| Demurrage: | 0 | Net Monthly: | 140.340 | | 23,00 | 4.172 | 0 |
| Despatch: | 0 | Net Revenue: | -6.031 | | 23,25 | 4.298 | 0 |
| Commission: | 8.640 | | | | 23,50 | 4.425 | 0 |
| Specified Expenses: | 3.533 | TCE | 17,54 | | 23,75 | 4.552 | 0 |
| Bunker Cost: | 67.456 | Break Even: | 24,88 | | 24,00 | 4.678 | 0 |
| Port Cost: | 30.014 | | | | 24,25 | 4.805 | 0 |
| Cargo Cost: | 0 | +/- 1: | 507 | | 24,50 | 4.932 | 0 |
| | | | | | 24,75 | 5.058 | 0 |
| | | Net Daily - Sensitivity basis | | | 25,00 | 5.185 | 0 |
| Net Freight: | 164.160 | +/-1000 Cargo:    /day | 1.689 | | 25,25 | 5.312 | 0 |
| Total Cost: | 101.003 | Extra steam day:   /day | -322 | | 25,50 | 5.438 | 0 |
| Net Income: | 63.157 | Extra port day:    /day | -322 | | 25,75 | 5.565 | 0 |

### Specified Expenses |

| | |
|---|---|
| Hold Cleaning:: | 1.000 |
| Miscellaneous expenses:: | 500 |
| Bonus to master:: | 750 |
| C/V/E : : | 473 |
| Insurance (P&I/FDD,etc..) :: | 810 |

# EXHIBIT D

# VOYAGE CALCULATION DRY

Printed: 10-9-2009 16:14

## Vessel | ONEGO PASSAT

| | | | |
|---|---|---|---|
| | | Running cost: | 5.125 /day | Speed | |
| Calculation: | 110859 | Curr: USD | Deadweight: | 8.000 | Draft/SSW: 6,40 | Loaded: | 12,00 |
| Calc. Date: | 9-9-2009 18:16 | | Sqm/Grain Cap.: | 336.943 | Ballast: | 12,00 |
| Done by: | RDB | | Bale Cap.: | 336.797 | |

## Charterers

| | | | | |
|---|---|---|---|---|
| Charterer: | EDF | Commodity: | SUGAR IN BAGS | Gross freight: | 316800 |
| Quantity: | 7200 M | Loading: | PUERTO QUETZAL | Commission: | 22176 |
| Rate: | 44 M | Discharge: | COATZACOALCOS | Net freight: | 294624 |
| Terms Load: | 1500 M - SHINC | Terms Disch. | 1000 M - SHEX | | |
| Commission: | 7,000 % | LOW: % | | | |

## Estimated Port Calls

| | T | J/D | Distance | Steam | Add.% | Port | Cost | C.Cost | Arrival | Departure |
|---|---|---|---|---|---|---|---|---|---|---|
| SAN ANTONIO | B | | | 0,00 | | | | | | 10-9-2009  6:25 |
| PUERTO QUETZAL | L | | 3045 | 10,57 | | 4,80 | 8000 | | 20-9-2009  20:05 | 25-9-2009  15:17 |
| PANAMA CANAL | C | 39 | 866 | 3,01 | | 1,00 | 26500 | | 28-9-2009  15:32 | 29-9-2009  15:32 |
| COATZACOALCOS | D | | 1330 | 4,62 | | 10,70 | 20002 | | 4-10-2009  6:25 | 14-10-2009  23:13 |

## Fuel Details

| Grade | Cons.Stm/day | Cons.Prt/day | Price | Total Cons.Tons | Total Cost | Voyage Days | | Extra |
|---|---|---|---|---|---|---|---|---|
| IFO | 11,00 | | 511 | 211,20 | 107.993 | Steam: | 18,20 | 1,00 |
| MDO | 1,00 | 1,00 | 597 | 36,20 | 21.611 | Port: | 16,50 | 0,50 |
| LSFO | | | 483 | 0,00 | 0 | Total days: | 36,20 | |
| LSMDO | | | 635 | 0,00 | 0 | Total distance: | 5.241 | |

## Financial Summary

| | | | | | Sensitivity Analysis | | |
|---|---|---|---|---|---|---|---|
| Gross Freight: | 316.800 | | | | Rate/WS | Net Daily | Lumpsum |
| Other Income: | 0 | Net Daily: | 2.896 | | 42,50 | 2.618 | 0 |
| Bunker Compensation: | 0 | Running Cost: | 185.525 | | 42,75 | 2.665 | 0 |
| Demurrage: | 0 | Net Monthly: | 86.880 | | 43,00 | 2.711 | 0 |
| Despatch: | 0 | Net Revenue: | -80.696 | | 43,25 | 2.757 | 0 |
| Commission: | 22.176 | | | | 43,50 | 2.803 | 0 |
| Specified Expenses: | 5.689 | TCE | 10,86 | | 43,75 | 2.850 | 0 |
| Bunker Cost: | 129.604 | Break Even: | 56,05 | | 44,00 | 2.896 | 0 |
| Port Cost: | 54.502 | | | | 44,25 | 2.942 | 0 |
| Cargo Cost: | 0 | +/- 1: | 185 | | 44,50 | 2.988 | 0 |
| | | | | | 44,75 | 3.035 | 0 |
| | | Net Daily - Sensitivity basis | | | 45,00 | 3.081 | 0 |
| | | +/-1000 Cargo: /day | 1.130 | | 45,25 | 3.127 | 0 |
| Net Freight: | 294.624 | Extra steam day: /day | -78 | | 45,50 | 3.173 | 0 |
| Total Cost: | 189.795 | Extra port day: /day | -78 | | 45,75 | 3.220 | 0 |
| Net Income: | 104.829 | | | | | | |

## Specified Expenses

| | |
|---|---|
| Hold Cleaning:: | 1.000 |
| Miscellaneous expenses:: | 500 |
| Bonus to master:: | 750 |
| C/V/E : : | 1.267 |
| Insurance (P&I/FDD,etc..) :: | 2.172 |

## Comments

*

# EXHIBIT E

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ONEGO SHIPPING & CHARTERING BV
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
Michael S. Weinstock (MW-8520)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ONEGO SHIPPING & CHARTERING BV,

                                  Plaintiff,

                                                                 09 CV _____ ( ____ )

        v.
                                                                 **ATTORNEY'S DECLARATION
                                                                 THAT DEFENDANT CAN NOT
                                                                 BE FOUND WITHIN THE
                                                                 DISTRICT FOR PURPOSES OF
                                                                 RULE B MARITIME
                                                                 ATTACHMENT**


OCEAN BULK CARRIERS CORP.,

                                  Defendant.
-------------------------------------------------------------X


This declaration is executed by the attorney for the Plaintiff, ONEGO SHIPPING &

CHARTERING BV, (hereinafter "ONEGO SHIPPING"), in order to secure the issuance

of a Summons and Process of Attachment and Garnishment in the above-entitled, *in*

*personam*, Admiralty cause.


        Pursuant to 28 U.S.C. § 1746, Owen F. Duffy, declares under penalty of perjury:

1.    I am a partner at the law firm of Chalos, O'Connor & Duffy LLP representing Plaintiff ONEGO SHIPPING in this case.

2.    I have personally inquired or have directed inquiries into the presence of the Defendant OCEAN BULK CARRIERS CORP in this District.

3.    I have personally checked with the office of the Secretary of State of the State of New York, using the Secretary of State's Division of Corporations database, and I have determined that, as of October 8, 2009, the Defendant OCEAN BULK CARRIERS CORP is not incorporated pursuant to the laws of New York, is not qualified to conduct business within the State of New York and has not nominated agents for the service of process within New York because the Secretary of State of the State of New York has no records for the Defendant OCEAN BULK CARRIERS CORP.

4.    I have inquired of Verizon Telephone Company whether the Defendant OCEAN BULK CARRIERS CORP can be located within this District.  The Verizon Telephone Company has advised me that the Defendant does not have any telephone number listings within this District.

5.    I have further consulted with several other telephone directories on the internet, and I have found no telephone listing or address for the Defendant OCEAN BULK CARRIERS CORP within this District.

6.    I have further made several searches on the internet with various search engines including Google and other and maritime websites, and I have found no indication that the Defendant OCEAN BULK CARRIERS CORP can be found within this District.

7.    In that I have been able to determine that the Defendant is not based in the District and that I have found no indication that the Defendant can be found within this District, I have formed a good faith belief that the Defendant does not have sufficient contacts or business activities within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty or Maritime Claims as set forth in the Federal Rules of Civil Procedure.

8.    It is my belief, based upon my own investigation that the Defendant cannot be found within this District for the purposes of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Port Washington, New York
      October 8, 2009

                                      CHALOS, O'CONNOR & DUFFY, LLP
                                      Attorneys for Plaintiff,
                                      ONEGO SHIPPING & CHARTERING BV

By:          _____
                           Owen F. Duffy (OD-3144)
                           Michael S. Weinstock (MW-8520)
                           366 Main Street
                           Port Washington, New York 11050
                           Tel:  (516) 767-3600
                           Fax:  (516) 767-3605

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Owen F. Duffy, declares under the penalty of perjury:

1.    That I am a partner at the law firm of Chalos, O'Connor & Duffy LLP, counsel for the Plaintiff, ONEGO SHIPPING AND CHARTERİNG BV., herein;

2.    That I have read the foregoing verified complaint and know the contents thereof;

3.    That I believe the matters to be true based on documents and information obtained from employees and representatives of the Plaintiff through its agents, underwriters and attorneys; and

4.    That the reason that this verification was made by deponent and not by the Plaintiff is because the verification of the officers of Plaintiff could not be obtained within the time constraints presented by the circumstances of this case.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Port Washington, New York
       October 8, 2009

                              CHALOS, O'CONNOR & DUFFY, LLP
                              Attorneys for Plaintiff,
                              ONEGO SHIPPING & CHARTERING BV

            By:    _____
                   Owen F. Duffy (OD-3144)
                   Michael S. Weinstock (MW-8520)
                   366 Main Street
                   Port Washington, New York 11050
                   Tel:  (516) 767-3600
                   Fax:  (516) 767-3605
                   Email: oduffy@codus-law.com